**In Re: WEST CARIBBEAN AIRWAYS, S.A., et al., Defendants.**

**Case No. 06–22748–CIV.**

United States District Court, S.D. Florida.

Sept. 27, 2007.

Michael David Ehrenstein, Ehrenstein Charbonneau Calderin, Miami, FL, Robin R. Anderson, Donald McCune, Mary Schiavo, Motley Rice LLC, Mt. Pleasant, SC, David L. Fiol, Lieff Global, LLP, Lexi J. Hazam, Robert L. Lieff, Lieff Cabraser Heimann & Bernstein, San Francisco, CA, Scott P. Schlesinger, Valerie A. Conzo, Sheldon J. Schlesinger, Sheldon J. Schlesinger P.A., Fort Lauderdale, FL, Ibrahim Reyes–Gandara, Silva & Silva, Coral Gables, FL, for Plaintiffs.

Henry Morrison Knoblock, Stephen Fraser Coxhead, Knoblock & Dohner, Daniella Friedman, Daniella Friedman P.A., Joseph Thompson Thornton, Beverly Dawn Eisenstadt, Thornton Davis & Fein, P.A., Miami, FL, Allan I. Mendelsohn, Sher & Blackwell LLP, Washington, DC, Christopher Kevin Leigh, Barthe & Leigh, Fort Lauderdale, FL, Marvin L. Szymkowicz, Savit & Szymkowicz LLP, Bethesda, MD, for Defendants.

## PRELIMINARY ORDER ON DEFENDANTS' MOTION TO DISMISS ON GROUNDS OF FORUM NON CONVENIENS

URSULA UNGARO, District Judge.

THIS CAUSE is before the Court upon Defendants' Motion to Dismiss on Grounds of Forum Non Conveniens. D.E. 54[1] This order follows a May 11, 2007 status conference during which the parties agreed to brief the following discrete issues pertaining to Defendants' Motion: (1) whether Newvac is a "contracting carrier" within the scope of the Montreal Convention;[2] and, whether the Court may apply the *forum non conveniens* doctrine in an action arising under the Montreal Convention. *See* D.E. 94 (Order Setting Briefing Schedule); 95 (Order Requesting a Statement of Interest from the United States);[3]

1. The Motion was filed by Defendants Jacques Cimetier, Newvac Corporation, and Go 2 Galaxy, Inc.

2. The Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999 (entered into force on Nov. 4, 2003), *reprinted in* S. Treaty Doc. No. 106–45, 1999 WL 33292734 (hereinafter "Montreal Convention").

3. The Court permitted the United States to submit a statement of interest, pursuant to 28 U.S.C. § 517, respecting its position as to the availability of the *forum non conveniens* doc-

97 (Tr. of Status Conf.). The Court has considered the parties' memoranda (D.E. 101, 113), the United States's Statement of Interest (D.E. 116), and is otherwise fully advised in the premises.

### Facts

This action arises out of the August 16, 2005 airplane crash in Venezuela of West Caribbean Airways flight 708, while en route from Panama to Martinique.[4] Plaintiffs are, and the decedents were, residents of Martinique, a Department of the Republic of France. *See* D.E. 152 (Am. Compl.) at paras. 7, 74. Defendant West Caribbean Airways, S.A. is a Colombian corporation with offices in Medellin, Colombia. *Id.* at para. 9. Defendants Newvac Corporation and Go 2 Galaxy, Inc. are Florida corporations. *Id.* at para. 15.

On March 15, 2005, Newvac entered into a "charter contract" with West Caribbean Airways in Medellin, Colombia, pursuant to which West Caribbean was to provide a 152–passenger MD–81 aircraft and crew, for charter flights occurring during May, July and August 2005. *See* D.E. 99 (McCune Decl.), Ex. "5" (English translation of Charter Contract, originally in Spanish, executed by Jacques Cimetier on behalf of Newvac, d/b/a Go–2 Vacations). Thereafter, on April 25, 2005, Newvac entered into a "contract for air chartering" with Globe Trotter Agency, a travel agency in Martinique, whereby Newvac agreed to provide the aircraft it chartered from West Caribbean to Globe Trotter for a series of excursions between Martinique and Panama. *See* D.E. 99 (McCune Decl.), Ex. "7" (English translation of Charter Contract, originally in French, executed by

Jacques Cimetier on behalf of Newvac, d/b/a Go–2 Vacations). Newvac also provided Globe Trotter with the hotel, transportation and "sightseeing" for these excursions. *See* D.E. 145 (Cimetier Depo.) at 185:6–186:4. All of the passengers were killed when West Caribbean's aircraft crashed during their return trip from Panama following one of the excursions sold by Globe Trotter. *See* D.E. 152 (Am. Compl.) at paras. 31–33, 41, 52, 75; D.E. 113 (Defs.' Reply) at 5.

### Contracting Carrier

The parties dispute whether Newvac is a "contracting carrier," as that term appears in Article 39 of the Montreal Convention (titled "Contracting Carrier—Actual Carrier"), which states:

> The provisions of this Chapter [5] apply when a person (hereinafter referred to as "the contracting carrier") as a principal makes a contract of carriage governed by this Convention with a passenger or consignor or with a person acting on behalf of the passenger or consignor, and another person (hereinafter referred to as "the actual carrier") performs, by virtue of authority from the contracting carrier, the whole or part of the carriage, but is not with respect to such part a successive carrier within the meaning of this Convention. Such authority shall be presumed in the absence of proof to the contrary.

Montreal Convention, art 39. This issue has importance because Plaintiffs wish to argue that this Court has jurisdiction over, and is required to adjudicate this dispute pursuant to Articles 33 and 46 of the

---

trine in a case governed by the Montreal Convention.

**4.** *See* Brian Ellsworth, *Airline Crash in Venezuela Kills 160* (visited Aug. 14, 2007) <http://www.npr.org/templates/story/story.php?storyId=4802464>.

**5.** "[T]his Chapter" refers to Chapter V of the Convention, titled "Carriage by Air Performed by a Person other than the Contracting Carrier."

Montreal Convention due to Newvac's domicile in the Southern District of Florida. *See, e.g.,* D.E. 101 (Pls.' Mem. in Opp'n to Mot.) at 4–5.

Plaintiffs first submit that there *must* be a "contracting carrier" in this case because the actual carrier—West Caribbean Airways—"had no opportunity to enter into a direct contractual relation with the passengers," and according to Plaintiffs, only Newvac fits within the term's definition. *Id.* at 6. Specifically, Plaintiffs submit that Newvac acted as a principal in this case because it profited by contracting for the seating capacity on the West Caribbean aircraft, thereafter reselling it for a higher price to Globe Trotter, which acted on behalf of passengers when it sold individual seats on the aircraft. *Id.* Plaintiffs add that West Caribbean performed "the whole or part of the carriage" under the authority of its contract with Newvac. *Id.* at 6–7 (also citing law review articles [6] that Plaintiffs submit in support of their argument that a tour operator that packages and resells air transportation is a "contracting carrier" under the Montreal Convention).

Plaintiffs further note that the term "carrier" is not defined in the Warsaw [7] or Montreal Conventions, and therefore, urge consideration of how the United States defines "carrier" in other related contexts. *Id.* at 8. In this regard, Plaintiffs cite section 40102(a)(2) of the Federal Aviation Act (*i.e.,* 49 U.S.C. § 40102(a)(2)), which defines an "air carrier" as "a citizen of the United States undertaking by any means, directly *or indirectly,* to provide air transportation." *Id.* (emphasis added). In ad-

dition, Plaintiffs cite 14 C.F.R. § 380.2, promulgated thereunder, which states in pertinent part: "Indirect air carrier means any person who undertakes to engage indirectly in air transportation operations and who uses for such transportation the services of a direct air carrier." *Id.* Plaintiffs also refer to the Air Transportation Operations Inspector's Handbook of the U.S. Federal Aviation Administration, Order 8400. 10, Change 36, Vol. 2, Ch. 1, § 2 at 2–12, which provides in pertinent part that:

> An indirect air carrier is a company that contracts aircraft and crew services from an air carrier or commercial operator but may not engage in control over the operational function of any flight. Examples of indirect air carriers include freight forwarders, brokers, or public charter operators. An indirect air carrier will act as an agent for either the customer or the air carrier . . . .

*See* D.E. 99 (McCune Decl.), Ex. "12". In addition, Plaintiffs cite federal cases supporting the proposition that travel agents, tour operators, charterers and nominal "social clubs" that sell tours and air transportation publicly may be considered "indirect air carriers" subject to certification and similar requirements under the FAA. *See* D.E. 101 (Pls.' Mem. in Opp'n to Mot.) at 9 (citing *Monarch Travel Servs. v. Associated Cultural Clubs,* 466 F.2d 552 (9th Cir.1972), *cert. denied,* 410 U.S. 967, 93 S.Ct. 1444, 35 L.Ed.2d 701 (1973); *Arkin v. Trans Int'l. Airlines, Inc.,* 568 F.Supp. 11 (E.D.N.Y.1982); *U.S. v. Caribbean Ven-*

**6.** Trevor Atherton, *Unlimited Liability for Air Passengers: The Position of Carriers, Passengers, Travel Agents and Tour Operators Under the IATA Passenger Liability Agreement Scheme,* 63 J. Air L. & Com. 405, 417–18 (1997); Tory A. Weigand, *The Modernization of the Warsaw Convention and the New Liabil-*

*ity Scheme for Claims Arising Out of International Flight,* 84 Mass. L.Rev. 175, 180 (2000).

**7.** The Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876 (1934), note following 49 U.S.C. § 40105 (hereinafter "Warsaw Convention").

*tures, Ltd.,* 387 F.Supp. 1256 (D.N.J. 1974)).

Plaintiffs also cite the U.S. Department of Transportation's "Notice on the Role of Air Charter Brokers in Arranging Air Transportation," which states in pertinent part:

The Enforcement Office has become aware that there are air charter brokers not holding economic authority from the Department who solicit and contract directly with a charter customer for air transportation and then solicit and separately contract directly with a direct air carrier to operate the air service promised to the charter customer under the charter broker's contract with that customer. With respect to payment for the proffered air transportation, two separate transactions commonly occur: (1) The air charter broker collects all of the monies paid by the charter customer pursuant to the broker's contract with the customer, and (2) the air charter broker then turns over a portion of these monies to the direct air carrier pursuant to the broker's separate contract with the carrier. In such instances, the air charter broker is not acting as an agent for the operating carrier or for the charter customer. Rather, the air charter broker is acting as a principal in both transactions, and, with respect to its relationship with the customer, is engaged in air transportation as an indirect air carrier without economic authority in contravention of the statutory and Department licensing requirements described above.

*Id.* (citing 69 Fed.Reg. 61429–02, 61430 (2004)). Plaintiffs submit that this description fits Newvac's role in the instant case, as Newvac made two separate transactions, one with Globe Trotter and the other with West Caribbean, making a profit on the difference between what it paid for the air transportation and the price it received from Globe Trotter. *Id.* at 9–10.

Finally, Plaintiffs suggest Newvac is a "loophole airline" and that public policy dictates that therefore, Newvac be considered a "contracting carrier." *Id.* at 10. The "loophole airline" label is given to unregulated U.S. entities that compete with U.S. carriers by chartering cheaper foreign-flagged aircraft with less stringent safety standards. *Id.* The problem of "loophole airlines" was addressed in a 1991 hearing before the Subcommittee on Investigations and Oversight of the U.S. House of Representatives' Commission on Public Works and Transportation. *Id.*

In response to Plaintiffs' arguments, Defendants maintain that Newvac was not a "contracting carrier" because there were no passengers with whom to contract when Newvac entered into its contract with Globe Trotter. *See* D.E. 113 (Defs.' Reply) at 4. Thus, Defendants submit that Newac could not have made a "contract of carriage" with any "passenger" nor "a person acting on behalf of the passenger," as required by the literal terms of Article 39. *Id.*

Defendants add that Newvac was an "independent intermediary" not in privity with any passenger in that: (a) Newvac sold the entire capacity of each flight to Globe Trotter; (b) it was for Globe Trotter, at its own risk, to sell individual seats to passengers; and; (c) the "carrier" to operate the flights was West Caribbean. *Id.* at 4–5. Further, Defendants note that Globe Trotter advertised the subject flights, solicited the passengers, and entered into "contracts of carriage" at the retail level with each of them. *Id.* Thus, Defendants submit that it is impossible to argue that Newvac, whether as principal or agent, entered into any contracts of carriage with any of the passengers. *Id.*

With respect to Plaintiffs' argument that Newvac acted as a principal because it sold the seats on the aircraft for more than it

paid West Caribbean, Defendants submit that if that is the test, then Globe Trotter was likewise acting as a principal in entering into contracts of carriage with the passengers because Globe Trotter sold the seats to each passenger for more than it paid Newvac. *Id.* at 5. According to Defendants, "it is an entirely illogical leap for plaintiffs to argue that merely because Newvac was acting as a principal vis-a-vis [West Caribbean], it was also acting as a principal in making contracts of carriage with the individual passengers." *Id.*

Defendants also note, respecting Plaintiffs' citation to U.S. Department of Transportation precedent and law, that Newvac's contracts with West Caribbean and Globe Trotter were executed abroad. *Id.* at 5–6. Accordingly, Defendants submit that "[f]or plaintiffs to argue that U.S. or U.S.D.O.T. law should apply to such foreign executed contracts, especially when the flight had no contact with the United States and none of the passengers was an American citizen or resident, would represent an extraterritorial extension of U.S. jurisdiction that would be both unprecedented and highly precarious in the history and current practice of international air law." *Id.* at 6.

Finally, Defendants submit that Plaintiffs' position would be bad policy in that it would expose "ordinary travel agents, individuals and small companies" to full common carrier liability. *Id.* at 6. According to Defendants, the liability requirements of a carrier operating to or from the United States are minimally $300,000,000, and for France $450,000,000. *Id.* Thus, Defendants maintain that imposing such requirements on individuals like Cimetier or companies like Newvac "would jeopardize the economic viability of very substantial segments of the airline industry." *Id.*

### Treaty Interpretation Principles

As noted in *Eastern Airlines, Inc. v. Floyd,* 499 U.S. 530, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991):

> When interpreting a treaty, we begin with the text of the treaty and the context in which the written words are used. Other general rules of construction may be brought to bear on difficult or ambiguous passages. Moreover, treaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties.

*Id.* at 534–35, 111 S.Ct. 1489 (internal citations and quotation marks omitted); *see also El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng,* 525 U.S. 155, 167, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999) (stating: "It is our responsibility to give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties. Because a treaty ratified by the United States is not only the law of this land, see U.S. Const., Art. II, § 2, but also an agreement among sovereign powers, we have traditionally considered as aids to its interpretation the negotiating and drafting history (*travaux préparatoires*) and the postratification understanding of the contracting parties") (internal citation and quotation marks omitted). Further, "[a]lthough not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 184–85, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982).

### Analysis

Again, Article 39 of the Montreal Convention states:

> The provisions of this Chapter apply when a person (hereinafter referred to

as "the contracting carrier") as a principal makes a contract of carriage governed by this Convention with a passenger or consignor or with a person acting on behalf of the passenger or consignor, and another person (hereinafter referred to as "the actual carrier") performs, by virtue of authority from the contracting carrier, the whole or part of the carriage, but is not with respect to such part a successive carrier within the meaning of this Convention. Such authority shall be presumed in the absence of proof to the contrary.

Montreal Convention, art. 39. The Court finds that the foregoing language is unambiguous and that under the facts of this case, it applies to Newvac.

By the plain terms of Article 39, Newvac is a "contracting carrier" in this case if it was: (1) a person ("the contracting carrier") that made a contract of carriage governed by the Montreal Convention; (2) it did so as a principal; (3) the contract was with a passenger or consignor, or with a person acting on either's behalf; and (4) another person ("the actual carrier") performed the carriage by virtue of authority from the "the contracting carrier."

■ First, Newvac is "a person" that made a "contract of carriage governed by [the] Convention." In this regard, the Court notes that the Convention "applies to all international carriage of persons . . . by aircraft . . . ." (*id.*, art. 1(1)), and that the contract between Newvac and Globe Trotter concerned the "international carriage" of persons by aircraft (*i.e.*, carriage of passengers from Martinique–Panama–Martinique onboard West Caribbean's MD–81 aircraft). *See* D.E. 99 (McCune Decl.), Ex. "7" (English translation of Newvac–Globe Trotter contract); Montreal Convention, art. 1(2) (providing that "international carriage means any carriage in which, according to the agreement between the parties, the place of departure and the place of destination . . . are situated either within the territories of two States Parties,[8] or within the territory of a single State Party if there is an agreed stopping place within the territory of another State, even if that State is not a State Party . . . ."). Thus, the Court finds that the Newvac–Globe Trotter contract is a contract of carriage governed by the Montreal Convention.

■ Further, Newvac acted as a "principal" when it made the contract of carriage with Globe Trotter. Under international and maritime law, a "person" can act either as an agent or a principal when contracting for transportation, depending on whether it acts on its own initiative or for another.[9] In this case, Newvac acted as a "principal" because *it* contracted with

---

**8.** France and Panama became "State Parties" to the Convention prior to the accident at issue herein. *See* International Civil Aviation Organization List and Current Status of International Air Law Multilateral Treaties/Montreal Convention (available at <http://www.icao.int/icao/en/leb/mtl99.pdf> (visited Sept. 4, 2007)).

**9.** *Cf. James N. Kirby, Pty Ltd. v. Norfolk Southern Ry. Co.*, 300 F.3d 1300, 1305–06 (11th Cir.2002), *rev'd on other grounds sub nom. Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004) (explaining that freight forwarders may act as agents of cargo owners or as principals and concluding that the freight forwarder under consideration acted as a principal); *accord* Clive M. Schmitthoff, *Schmitthoff's Export Trade, The Law and Practice of International Trade* 302–05 (9th ed. 1990) (also noting that in the context of modern international transportation Conventions such as the Guadalajara Convention, a "contractual carrier is a person who has contracted to move the goods from one place to another, although he does not carry out the transportation himself but leaves this task to the actual carrier with whom he has contracted"); *id.* at 623 (noting that a "contracting carrier" is one who "as a principal, makes an agreement for carriage with the consignor or the con-

West Caribbean for its aircraft and crew, and then independently contracted to supply air transportation and ancillary services to Globe Trotter. *See* D.E. 99 (McCune Decl.). Ex. "7" (English translation of Newvac–Globe Trotter contract) at 1 (providing that "[Globe Trotter] wishes to charter seats from [Newvac]" and that "[Newvac] shall make available ... passenger transport ....").

In reaching this conclusion, the Court has considered Defendants' contention that Newvac cannot be deemed a "principal" because it merely assigned the aircraft's seating capacity to Globe Trotter. But this argument, as the Court understands it, assumes that Newvac cannot be characterized as a "principal" without the Court identifying a corresponding agent, in this case Globe Trotter. This assumption is unwarranted. The language of Article 39 is derived from the Guadalajara Convention's definitions of "contracting carrier" and "actual carrier." *See* S. Treaty Doc. No. 106–45, 1999 WL 33292734, at 10, 18, 34.[10] The term "principal" under Guadalajara did not contemplate the necessity of an agency relationship; that is, that because there is a "principal" there must be an agent. The term was specifically used to clarify that those acting solely as agents could not qualify as "contracting carriers."[11] In any event, Defendants' argu-

ment relies on a distortion of the facts because during the term of its contract with Globe Trotter, Newvac remained responsible for supplying the aircraft and crew, and monitoring and ensuring West Caribbean's performance of the Newvac–Globe Trotter contract. *See* D.E. 99 (McCune Decl.). Ex. "7" (English translation of Newvac–Globe Trotter contract) at 1; D.E. 145 (Cimetier Depo.) at 178:16–179–12, 190:25–191:7, 212:21–214:17. These facts show that West Caribbean was acting "by virtue of authority from [Newvac]" in transporting the passengers. More importantly, they illustrate that Newvac stepped into the shoes of and assumed the role of "carrier."

■ Finally, although Defendants advance an interpretation of the language, "acting on behalf of the passenger," as requiring Globe Trotter to be acting on behalf of passengers identified prior to Newvac's execution of the Newvac–Globe Trotter contract, the Court declines to adopt this rigid construction. Courts utilize flexible principles to interpret treaty provisions and effect the drafters' intentions. *See Floyd,* 499 U.S. at 535, 111 S.Ct. 1489 (noting that treaties are construed more liberally than private agreements); *accord Western Digital Corp. v. British Airways, PLC,* [2001] 1 All E.R. 109 at paras. 38–40; *Air France v. Saks,*

---

signor's agent. In many cases the contracting carrier will be the first or sometimes the only carrier by air, but the contracting carrier may also be one who merely issues a waybill, or an aircraft charterer, or a cargo consolidator or forwarder"); *see also* 69 Fed.Reg. 61429–02, 61430 (2004) (quoted above, outlining the scenario where an air charter broker acts as a principal, not as agent, respecting its relationship with both the air carrier and the customer, and with respect to the latter, "is engaged in air transportation as an indirect air carrier ....").

**10.** Citations are to the page numbers in the printed document.

**11.** *See* International Civil Aviation Organization Doc. 8301–LC/149–1, Minutes of the International Conference on Private Air Law, Guadalajara, Aug.-Sept. 1961, at 39–48, 186–89, 199–200, 262–64; Doc. 8301–LC/149–2, Documents, at 19, 46, 48; Restatement (Third) of Agency § 1.01 cmt. b (2006) (recognizing that: "the terminology of agency is widely used in commercial settings and academic literature to characterize relationships that are not necessarily encompassed by the legal definition of agency.... In commercial settings, the term "principal" is often used to designate one who benefits from or is affected by the acts of another, or one who sponsors or controls another").

470 U.S. 392, 405, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985) (defining the term "accident" in the context of Article 17 of the Warsaw Convention and noting that "[t]his definition should be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries"). Newvac and Globe Trotter clearly contemplated that Globe Trotter would procure passengers for the flights and the fully inclusive tour packages that were to be supplied by Newvac, and that Globe Trotter would act on behalf of the passengers in this regard. The parties' expectations are evident from the Newvac–Globe Trotter contract, which required that once the passengers purchased their tour packages from Globe Trotter, Globe Trotter was obligated to forward the passengers' information to Newvac so that Newvac could, among other things, issue the corresponding travel documents, including the individual passenger tickets. *See* D.E. 99 (McCune Decl.), Ex. "7" (English translation of Newvac–Globe Trotter contract) at 4, para. 8; 145 (Cimetier Depo.) at 212:21–214:17. Thus, the fact that the actual passengers were not known at the inception of the Newvac–Globe Trotter contract should not, in the Court's view, be determinative. *Cf. Block v. Compagnie Nationale Air France*, 386 F.2d 323, 334–36 (5th Cir.1967) (examining whether the Warsaw Convention applied in the context of an accident involving a chartered aircraft and determining, *inter alia*, that un-

der the facts of the case (*e.g.*, the charterer "was to obtain the passengers for the flight"), the charterer acted on behalf of the passengers in entering into the charter agreement). Rather, the focus should be on the fact that Newvac knowingly assumed the responsibility to supply the aircraft and crew, and to otherwise conduct itself as an air carrier, for the transportation of Globe Trotter's customers. Therefore, the Court finds that Newvac was a "contracting carrier" within the meaning of Article 39 of the Montreal Convention.[12]

### *Forum Non Conveniens*

Plaintiffs, relying in large part on *Hosaka v. United Airlines, Inc.*, 305 F.3d 989 (9th Cir.2002), contend that Newvac's status as a "contracting carrier" confers mandatory jurisdiction on this Court pursuant to Article 33 of the Montreal Convention, thereby precluding dismissal of the actions based on *forum non conveniens*. *See, e.g.*, D.E. 101 (Pls.' Mem. in Opp'n to Mot.) at 11–27. Defendants respond that the Montreal Convention's drafting history reflects that the signatory countries contemplated that *forum non conveniens* would remain a valuable procedural tool for the dismissal of litigation with tenuous relationships to the United States. *See, e.g.*, D.E. 113 (Defs.' Reply) at 9–16.

The Ninth Circuit Court of Appeals held in *Hosaka* that "Article 28(1) [13] of the

---

**12.** Although the Court is not persuaded that the authority Plaintiffs cite from the Federal Aviation Act (*see* D.E. 101 (Pls.' Mem. in Opp'n to Mot.) at 8–10) is applicable to the issue of whether Newvac is a "contracting carrier" under the Montreal Convention, the citations were at least helpful in illustrating the role that "indirect air carriers," which engage in conduct not unlike that of Newvac herein, play in relation to passengers and carriers. *See, e.g.*, Romualdo P. Eclavea, Annotation, *Regulation of air travel clubs, charter flights, and the like, by the Civil Aeronautics*

Board, 27 A.L.R. Fed. 154 (1976) (outlining federal decisions interpreting pertinent statutory and regulatory provisions).

**13.** Article 28 provided:
(1) An action for damages must be brought, at the option of the plaintiff, in the territory of one of the High Contracting Parties, either before the court of the domicile of the carrier or of his principal place of business, or where he has a place of business through which the contract has been made, or before the court at the place of destination.

Warsaw Convention overrides the discretionary power of the federal courts to dismiss an action for forum non conveniens." *Hosaka*, 305 F.3d at 993, 1004. In so holding, the Ninth Circuit rejected the decision of the Fifth Circuit Court of Appeals, the only other United States appellate court to have considered the issue, that Article 28(1) of the Warsaw Convention did not prevent a district court from considering and applying the doctrine of *forum non conveniens*. *See In re Air Crash Disaster Near New Orleans, La., on July 9, 1982*, 821 F.2d 1147 (5th Cir.1987) (en banc), *vacated on other grounds sub nom. Pan American World Airways, Inc. v. Lopez*, 490 U.S. 1032, 109 S.Ct. 1928, 104 L.Ed.2d 400 (1989), *vacated in part and aff'd in part on remand* 883 F.2d 17 (5th Cir.1989).[14]

In reaching its conclusion, the Ninth Circuit in *Hosaka* found the text of Article 28 to be ambiguous, but that the treaty's purposes, its drafting history, as well as evidence of the parties' post-ratification understanding and the treatment of the issue in other treaties and by other courts, supported its decision. *See Hosaka*, 305 F.3d at 1003–04. However, the Warsaw Convention was negotiated at a time when the doctrine of *forum non conveniens*, as it exists today, was not even recognized by United States courts. *Id.* at 999, n. 13, 1002–03; *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 248 n. 13, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). Further, the Ninth Circuit acknowledged in *Hosaka* that the Montreal Convention is an entirely new

treaty and that Article 33, although similar to Article 28, has its own distinct drafting history shedding no light on the intention of the drafters of the Warsaw Convention respecting the availability of *forum non conveniens* in a case arising thereunder. *See Hosaka*, 305 F.3d at 999–1001. Thus, the Ninth Circuit made clear in *Hosaka* that it was not opining on the availability of *forum non conveniens* dismissals under the then unratified Montreal Convention: "We offer no opinion as to whether the text and drafting history of the Montreal Convention demonstrate whether forum non conveniens would be available in an action brought under that as-yet-unratified treaty." *Id.* at 1001 n. 17.

For these reasons, *Hosaka* has limited precedential value on the ultimate issue of the availability of *forum non conveniens* under the Montreal Convention. Accordingly, this Court is left with the duty to resolve—apparently as a matter of first impression—whether the doctrine of *forum non conveniens* can be considered in a case arising under the Montreal Convention. To do so, the Court again resorts to the flexible principles applicable to treaty interpretation, examining first the text of the treaty and the historical context in which it was drafted, the purpose of the treaty, its drafting history, and the post-ratification understanding of the Convention States. *See Floyd*, 499 U.S. at 534–35, 111 S.Ct. 1489; *Tseng*, 525 U.S. at 167, 119 S.Ct. 662. The Court also considers the United States' Statement of Interest

---

(2) Questions of procedure shall be governed by the law of the court to which the case is submitted.

Warsaw Convention, art. 28.

**14.** The only other published decision from a United States court addressing the availability of *forum non conveniens* in Warsaw Convention cases is *In re Air Crash Off Long Island, N. Y., on July 17, 1996*, 65 F.Supp.2d 207 (S.D.N.Y.1999). In that case, the district court held that "[f]orum non conveniens is a procedural tool available to U.S. courts and thus squarely falls within the literal language of [Warsaw Convention] Article 28(2)." *Id.* at 214. On the other hand, in *Milor S.R.L. v. British Airways, PLC*, [1996] Q.B. 702 (Eng.C.A.), the Court of Appeal of England concluded that Article 28 of the Warsaw Convention precluded application of the *forum non conveniens* doctrine in Convention cases.

filed in this action; "[a]lthough not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." *Avagliano,* 457 U.S. at 184–85, 102 S.Ct. 2374; *accord Sanchez–Llamas v. Oregon,* 548 U.S. 331, 126 S.Ct. 2669, 2685, 165 L.Ed.2d 557 (2006). In the final analysis, however, it is the Court's responsibility "to give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties." *Tseng,* 525 U.S. at 167, 119 S.Ct. 662 (quoting *Saks,* 470 U.S. at 399, 105 S.Ct. 1338).

### a. *Text of the Treaty*

Article 33 ("Jurisdiction") provides that:
1. An action for damages must be brought, at the option of the plaintiff, in the territory of one of the States Parties, either before the court of the domicile of the carrier or of its principal place of business, or where it has a place of business through which the contract has been made or before the court at the place of destination.
2. In respect of damage resulting from the death or injury of a passenger, an action may be brought before one of the courts mentioned in paragraph 1 of this Article, or in the territory of a State Party in which at the time of the accident the passenger has his or her principal and permanent residence and to or from which the carrier operates services for the carriage of passengers by air, either on its own aircraft, or on another carrier's aircraft pursuant to a commercial agreement, and in which that carrier conducts its business of carriage of passengers by air from premises leased or owned by the carrier itself or by another carrier with which it has a commercial agreement.
3. For the purposes of paragraph 2,
 (a) "commercial agreement" means an agreement, other than an agency agreement, made between carriers and relating to the provision of their joint services for carriage of passengers by air;
 (b) "principal and permanent residence" means the one fixed and permanent abode of the passenger at the time of the accident. The nationality of the passenger shall not be the determining factor in this regard.
4. Questions of procedure shall be governed by the law of the court seised of the case.

Montreal Convention, art. 33.

■ Like Article 28 of the Warsaw Convention, the text is silent respecting the *forum non conveniens* doctrine, but it expressly provides that questions of procedure shall be governed by the law of the forum. However, unlike the *Hosaka* Court, this court finds the above-quoted language to be unambiguous and dispositive: since the doctrine of *forum non conveniens* was firmly entrenched in the procedural law of the United States by the time the Montreal Convention was drafted, the text by implication clearly permits the application of the doctrine in domestic litigation.

This construction, moreover, comports with the rules commonly used by courts to construe treaty provisions. It is consistent with the international law principle endorsed by the Supreme Court of the United States, that "absent a clear and express statement to the contrary, the procedural rules of the forum State govern the implementation of the treaty in that State." *Breard v. Greene,* 523 U.S. 371, 375, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998) (per curiam); *accord Sanchez–Llamas,* 126 S.Ct. at 2682–83; *Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 700, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988); *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court for Southern Dist. of Iowa,* 482 U.S. 522, 539, 107 S.Ct.

2542, 96 L.Ed.2d 461 (1987); *see also Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 262, 104 S.Ct. 1776, 80 L.Ed.2d 273 (1984) (Stevens, J., dissenting) (noting that "[g]iven the gulfs of language, culture, and values that separate nations, it is essential in international agreements for the parties to make explicit their common ground on the most rudimentary of matters"). It harmonizes and gives effect to every word of Article 33 by construing the language "brought, at the option of the plaintiff" to mean the place where the plaintiff may initiate the action, subject to the application of the procedural doctrine of *forum non conveniens* as provided for in subsection (2).[15] It also avoids the need to graft language onto subsection (2) so that it would read: "Questions of procedure, other than *forum non conveniens*, shall be governed by the law of the court seised of the case"—a result the law plainly does not permit.[16]

Notwithstanding the conclusion that the text unambiguously permits application of the *forum non conveniens* doctrine in Montreal Convention cases, it remains the Court's responsibility to interpret Article 33 consistently with the shared expectations of the contracting parties. *Tseng*, 525 U.S. at 167, 119 S.Ct. 662. Accordingly, the Court considers below whether the historical context in which the Convention was drafted, the purpose, the drafting history, the post-ratification understanding of the contracting parties, if any, and the meaning accorded to Article 33 by the agencies responsible for its negotiation and enforcement, support the conclusion that *forum non conveniens* may be employed in Montreal Convention cases pursuant to Article 33(4). *Id.*; *Floyd*, 499 U.S. at 534–35, 111 S.Ct. 1489; *Sanchez–Llamas*, 126 S.Ct. at 2685.

### b. *Historical Context*

In reaching the conclusion that the plain language of Article 33 permits the application of *forum non conveniens* in Montreal Convention cases, the undersigned acknowledges that subsection (1) and subsection (4) of Article 33 are nearly identical to Article 28(1),(2) of the Warsaw Convention, and that the Ninth Circuit Court of Appeals in *Hosaka*, as well as Lord Phillips in

**15.** *See In re Commissioner's Subpoenas*, 325 F.3d 1287, 1296 (11th Cir.2003) (noting that "in treaty interpretation as in statutory interpretation, particular provisions may not be divorced from the document as a whole and read in insolation"); *Itel Containers Int'l v. Huddleston*, 507 U.S. 60, 65–66, 113 S.Ct. 1095, 122 L.Ed.2d 421 (1993) (rejecting an interpretation of an international convention that would render some of its language superfluous); *see also Maximov v. U.S.*, 373 U.S. 49, 54, 83 S.Ct. 1054, 10 L.Ed.2d 184 (1963) (stating that "it is particularly inappropriate for a court to sanction a deviation from the clear import of a solemn treaty between this Nation and a foreign sovereign, when ... there is no indication that application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories").

**16.** As early as 1821, the Supreme Court recognized that:

[T]his Court does not possess any treaty-making power. That power belongs by the constitution to another department of the Government; and to alter, amend, or add to any treaty, by inserting any clause, whether small or great, important or trivial, would be on our part an usurpation of power, and not an exercise of judicial functions. It would be to make, and not to construe a treaty. Neither can this Court supply a *casus omissus* in a treaty, any more than in a law. We are to find out the intention of the parties by just rules of interpretation applied to the subject matter; and having found that, our duty is to follow it as far as it goes, and to stop where that stops-whatever may be the imperfections or difficulties which it leaves behind.

*The Amiable Isabella*, 19 U.S. 1, 71, 6 Wheat. 1, 5 L.Ed. 191 (1821); *accord Sanchez–Llamas*, 126 S.Ct. at 2679.

*Milor S.R.L. v. British Airways, PLC,* [1996] Q.B. 702 (Eng.C.A.), concluded that the sentence "[q]uestions of procedure shall be governed by the law of the court to which the case is submitted" in Article 28(2) did not authorize the application of *forum non conveniens* in Warsaw Convention cases. However, the authors of those opinions were seeking to ascertain the shared expectations of the signatories to a treaty that was drafted in 1925 and 1929, at a time when the *forum non conveniens* doctrine was rarely utilized, its contours were undeveloped and its "procedural" character was unsettled. *See Hosaka,* 305 F.3d at 999, n. 13, 1002–03; *accord Milor S.R.L. v. British Airways, PLC,* [1996] Q.B. 702 (Eng.C.A.); *Saks,* 470 U.S. at 401, 105 S.Ct. 1338.[17] Therefore, there is little, if any evidence, reflecting that the drafters of the Warsaw Convention then understood that the inclusion of the language "[q]uestions of procedure shall be governed by the law of the court seised of the case" encompassed *forum non conveniens.*

The same conclusion cannot be reached with respect to the Montreal Convention; federal courts in the United States faced with cases arising out of international transactions and mass torts, among others, have utilized the doctrine routinely since 1947 to assess whether litigation should occur in a more convenient foreign forum, including in Warsaw Convention cases.[18] The historical context of the Montreal Convention thus reflects that, by the time it was drafted, the doctrine was widely understood to be a procedural device frequently employed in United States courts. *See generally* 14D C. Wright, A. Miller & E. Copper, Federal Practice and Procedure § 3828 (3d ed. 2007); *American Dredging Co. v. Miller,* 510 U.S. 443, 453, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994) (noting that *forum non conveniens* is a doctrine of procedure rather than substance). Moreover, *Hosaka* had not been decided in

---

17. As of 1929, when the Warsaw Convention was negotiated, the term *"forum non conveniens"* was not even in use in courts in the United States, although some American courts had recognized the discretion of trial courts to refuse jurisdiction in certain types of cases. *See* Edward L. Barrett, Jr., *The Doctrine of Forum Non Conveniens,* 35 Cal. L.Rev. 380, 386–89 (1947); Alexander Reus, *Judicial Discretion: A Comparative View of the Doctrine of Forum Non Conveniens in the United States, the United Kingdom, and Germany,* 16 Loy. L.A. Int'l & Comp. L.J. 455, 460–464. By 1941, Justice Frankfurter referred to the "familiar doctrine of forum non conveniens" as a manifestation of a civilized judicial system which is "firmly imbedded in our law." *Baltimore & O.R. Co. v. Kepner,* 314 U.S. 44, 55–56, 62 S.Ct. 6, 86 L.Ed. 28 (1941) (Frankfurter, J., dissenting). Even then, however, the parameters of the doctrine remained unclear until 1947, when the United States Supreme Court decided *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), and *Koster v. Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067

(1947). *See Reyno,* 454 U.S. at 248 n. 13, 102 S.Ct. 252.

18. *McLoughlin v. Commercial Airways (Pty) Ltd.,* 602 F.Supp. 29 (E.D.N.Y.1985) (denying motion); *Harpalani v. Air India, Inc.,* 622 F.Supp. 69 (N.D.Ill.1985) (denying motion); *In re Air Crash Disaster Near New Orleans, La., on July 9, 1982,* 821 F.2d 1147 (5th Cir.1987) (en banc) (affirming district court's denial of motion); *Galu v. Swiss Air Transport Co., Ltd.,* No. 86 Civ. 5551, 1987 WL 15580 (Aug. 3, 1987) (denying motion); *Robert Bosch Corp. v. Air France,* 712 F.Supp. 688 (N.D.Ill.1989) (denying motion); *Lu v. Air China Intern. Corp.,* No. CV 92–1254, 1992 WL 453646 (E.D.N.Y. Dec. 16, 1992) (unreported case granting motion, and agreeing (*id.* at *1 n. 1) with the Fifth Circuit's reasoning in *New Orleans that forum non conveniens* is applicable to a Warsaw Convention case); *Thach v. China Airlines, Ltd.,* No. 95 Civ. 8468, 1997 WL 282254 (S.D.N.Y. May 27, 1997) (denying motion); *In re Air Crash Off Long Island, N. Y., on July 17, 1996,* 65 F.Supp.2d 207 (S.D.N.Y.1999) (denying motion).

1999, when the final draft of the Montreal Convention was completed. At that time, the only United States decision that had addressed directly the availability of *forum non conveniens* in Warsaw Convention cases in the United States was the Fifth Circuit's decision in *In re ... New Orleans*, and it had held that *forum non conveniens* was available, stating:

> The delegates, however, recognized that the [Warsaw] Convention's provisions would have to be applied and adopted to a variety of legal systems, so they provided in Article 28(2) that "[q]uestions of procedure shall be governed by the law of the court to which the case is submitted."

> Plaintiffs insist that article 28(1)'s language "at the option of the plaintiff" grants them the absolute and inalterable right to choose the national forum in which their claims will be litigated. We cannot agree.... The party initiating the action enjoys the perogative [sic] of choosing between these possible national forums but that selection is not inviolate. That choice is then subject to the procedural requirements and devices that are part of that forum's internal laws.... We simply do not believe that the United States through adherence to the Convention has meant to forfeit such a valuable procedural tool as the doctrine of forum non conveniens.

*In re Air Crash Disaster Near New Orleans, La., on July 9, 1982*, 821 F.2d 1147, 1161–62 (5th Cir.1987) (internal citations and footnotes omitted).[19]

■ Viewed in this context, the undersigned cannot agree with Plaintiffs' argument that interpreting Article 33 to allow for application of *forum non conveniens* would be inconsistent with Article 57 of the Montreal Convention prohibiting "reservations." The difficulty with this argument is that it presupposes that the drafters did not understand that *forum non conveniens* is part of the procedural law of the United States and that they did not anticipate that *forum non conveniens* would continue to be employed in United States courts. Neither the text of Article 33 nor its historical context support this pre-supposition for the reasons explained above, and therefore no "reservation" is necessary for a United States court to be able to consider the "procedural question" of whether an action under the Montreal convention should be dismissed pursuant to *forum non conveniens*.

■ The Court also is not persuaded by Plaintiffs' argument that the drafters' failure to address the location of the fora to which a case could be "transferred" indicates that they did not intend to allow the application of *forum non conveniens* in United States courts and elsewhere the doctrine is employed. While the drafters may have aspired to achieve uniformity and predictability in the implementation of the Montreal Convention's liability regime, the historical record reflects that the

---

19. The Second Circuit also had stated in *Smith v. Canadian Pacific Airways, Ltd.*, 452 F.2d 798 (2d Cir.1971), that:

> [I]n a Warsaw Convention case there are two levels of judicial power that must be examined to determine whether suit may be maintained. The first level ... is that of jurisdiction in the international or treaty sense under Article 28(1). The second level involves the power of a particular United States court, under federal statutes and practice, to hear a Warsaw Convention

case-jurisdiction in the domestic law sense. *It is only after jurisdiction in both senses is had that the question of venue is reached and a determination made regarding the appropriateness and convenience for the parties of a particular domestic court.*

*Id.* at 800 (footnote omitted) (emphasis added); *accord Campbell v. Air Jamaica, Ltd.*, 863 F.2d 1 (2d Cir.1988); *Kapar v. Kuwait Airways Corp.*, 845 F.2d 1100, 1104–05 (D.C.Cir. 1988).

drafters were tasked with harmonizing the conflicting interests of numerous countries with different legal systems, including widely disparate procedural rules. The Montreal Convention, like most treaties, was the product of consensus and the absence of a provision does not necessarily imply anything more than mere compromise. *See, e.g., Franklin Mint Corporation,* 466 U.S. at 262, 104 S.Ct. 1776 (Stevens, J., dissenting) (noting that "[t]he great object of an international agreement is to define the common ground between sovereign nations. Given the gulfs of language, culture, and values that separate nations, it is essential in international agreements for the parties to make explicit their common ground on the most rudimentary of matters").[20]

### c. *Purpose of the Treaty*

Plaintiffs also submit that *Hosaka*'s reasoning respecting the primary purposes of the Warsaw Convention is equally applicable to cases arising under the Montreal Convention. *See* D.E. 101 (Pls.' Mem. in Opp'n to Mot.) at 19. In *Hosaka,* the Court found that application of the *forum non conveniens* doctrine would undermine the Warsaw Convention's dual goals of (i) uniformity, and (ii) the balance that the drafters sought to strike between the interests of air carriers and passengers. *See Hosaka,* 305 F.3d at 996–97. In reaching this conclusion, the *Hosaka* Court relied on the *Milor* Court's reasoning, citing with

approval the statement that Article 28 of the Warsaw Convention is "a self-contained code" harmonizing different national views on jurisdiction. *Id.* at 997.

■ Plaintiff's argument fails to take account of the fact that the stated purpose of the Montreal Convention was to "modernize and consolidate the Warsaw Convention and related instruments,"[21] and to "ensur[e] protection of the interests of consumers in international carriage by air and the need for equitable compensation based on the principle of restitution." Montreal Convention, Preamble. As such, it was intended to replace the system of liability contained in the Warsaw Convention:

> The Montreal Convention is the product of an effort by the International Civil Aviation Organization, a specialized agency of the United Nations, to reform the Warsaw Convention so as to 'harmonize the hodgepodge of supplementary amendments and intercarrier agreements' of which the Warsaw Convention system of liability consists.... The Montreal Convention is not an amendment to the Warsaw Convention. Rather, the Montreal Convention is an entirely new treaty that unifies and replaces the system of liability that derives from the Warsaw Convention....

*Ehrlich v. Am. Airlines, Inc.,* 360 F.3d 366, 371 n. 4 (2d Cir.2004) (internal citations omitted).[22] Thus, *Hosaka*'s reliance on the purposes of the Warsaw Convention

---

**20.** That the Montreal Convention was the product of compromise and consensus is evident from the remarks of the Chairman, quoted at page 1325–26, *infra,* in advocating the adoption of a "consensus package" that included the language now found in Article 33.

**21.** Namely, the Hague Protocol of 1955, the Guadalajara Supplementary Convention of 1961, the Guatemala City protocol of 1971, and the Montreal Protocols 1–4 of 1975. *See* Montreal Convention, art. 55.

**22.** As noted by President Clinton in his letter of transmittal to the Senate:

> Among other benefits, the Convention eliminates the cap on carrier liability to accident victims; holds carriers strictly liable for proven damages up to 100,000 Special Drawing Rights (approximately $135,000) ...; provides for U.S. jurisdiction for most claims brought on behalf of U.S. passengers; clarifies the duties and obligations of carriers engaged in code-share operations; and, with respect to cargo, preserves all of

to conclude that *forum non conveniens* dismissals were unavailable in United States courts under the earlier treaty, is not entirely persuasive to this Court which is tasked with deciding the availability of this procedural tool under the new treaty.

Indeed, at least one of the purposes of the Montreal Convention, modernization, actually supports the viability of *forum non conveniens* dismissals in cases arising thereunder. As already noted, at the time the Montreal Convention was drafted, the only case in the United States directly addressing the availability of *forum non conveniens* in cases brought under the Warsaw Convention had found the doctrine to be applicable and other courts had applied the doctrine in Warsaw Convention cases without engaging in treaty interpretation. *See supra* note 18. Also, at least one other foreign court had employed the doctrine in a Warsaw Convention case. *See Brinkerhoff Maritime Drilling Corp. v. P.T. Airfast Servs. Indonesia* [1992] SGCA 45 (available at http://app.supremecourt.gov.sg/default.aspx?pgID= 1127 (visited Aug. 28, 2007)). Thus, utilization of the doctrine comported with modern practice at the time the Montreal Convention was negotiated and is consistent with the Montreal Convention's stated goal of "modernization."

 Nonetheless, the Court accepts Plaintiffs' assertion that the drafters of the Montreal Convention, like the drafters of the Warsaw Convention, aspired to uniformity and predictability in the implementation of its liability scheme. These goals, however, do not necessarily suggest that the drafters of the Montreal Convention viewed *forum non conveniens* as repugnant or incompatible with its jurisdictional provisions. Although the delegates clearly knew that United States courts were applying *forum non conveniens* in Warsaw

Convention cases, not a single proposal appears in the Minutes of the Conference or related documents precluding the application of *forum non conveniens* in Montreal Convention cases. Instead, the drafting history, explained in greater detail below, reflects that the delegates considered various proposals which would have expressly sanctioned the use of *forum non conveniens* in cases brought in the fifth jurisdiction or clarified its status as a procedural question under Article 33(4); however, no consensus could be reached due mainly to the fear that codification would be interpreted as requiring countries unfamiliar with the doctrine to employ it. The absence of language articulating *forum non conveniens* principles in the final document, thus, suggests that the drafters intended to maintain the status quo: that United States courts, as well as the courts of other States recognizing the doctrine, would continue to apply *forum non conveniens* in Montreal Convention and other cases, while others would not.

 Moreover, *Hosaka,* in buying into the *Milor* Court's reasoning that the Warsaw Convention was intended to include a "self contained jurisdictional code" with which *forum non conveniens* conflicted, appears to have overlooked that in the United States the doctrine of *forum non conveniens* has co-existed with the concept of jurisdiction for many decades. In *Smith,* the Second Circuit Court of Appeals explained pelucidly the relationship between jurisdiction and venue in the context of a Warsaw Convention case. *See supra* note 19 (citing *Smith,* 452 F.2d 798). *Forum non conveniens* is not a jurisdictional question, but rather a supervening question of proper venue. *See Am. Dredging Co. v. Miller,* 510 U.S. 443, 453, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994). Therefore, whether under Warsaw or Montreal,

---

the significant advances achieved by Montreal Protocol No. 4.

S. Treaty Doc. No. 106–45, 1999 WL 33292734, at 8.

the first issue in any case should be whether there is treaty jurisdiction, meaning whether the case has been brought in one of the fora described by the applicable treaty, the second issue should be whether there is subject matter jurisdiction under domestic law, and the third issue should be whether venue is proper and appropriate. *See supra* note 19.

The record also does not reflect that drafters of the Montreal Convention, assuming they understood *forum non conveniens* to be a jurisdictional question, accorded the objective of formulating a "self-contained jurisdictional code" the primacy ascribed in the *Hosaka* and *Milor* opinions to the drafters of the Warsaw Convention. Like the Warsaw Convention, the predominant objectives of the Montreal Convention were the creation of a new uniform system of liability governing the international transportation of passengers and cargo, and the balancing of the interests of the air carriers and passengers. However, when the Warsaw Convention was drafted the doctrine of *forum non conveniens* was undeveloped and rarely invoked. By 1999, its contours had been defined and it had been widely employed in United States courts in international cases, although never to the detriment of a Warsaw Convention plaintiff in a reported case.[23] In other words, the doctrine did not pose a significant threat to uniform implementation of the Montreal Convention's liability regime. Hence, there were no proposals at the Conference to exclude it as a procedural device.

 In any event, the Court simply does not perceive how application of the doctrine, as a practical matter, undermines uniform implementation of the Montreal Convention or the balance it seeks to strike between the interests of the passengers and the airlines. *Forum non conveniens*, as it has developed in the United States, requires, among other factors, that the movant, in order to upset the plaintiff's choice of forum, demonstrate the existence of an "adequate alternative forum" that has a paramount private and public interest in the case. *See Reyno*, 454 U.S. at 255 n. 22, 257–261, 102 S.Ct. 252; 14D C. Wright, A. Miller & E. Copper, Federal Practice and Procedure §§ 3828.3, 3828.4 (3d ed. 2007). Since treaty jurisdiction can be established only in one of the fora described in Article 33 (*see, e.g., Smith*, 452 F.2d at 802–03), it is difficult to conceive of a dismissal based on *forum non conveniens* in a Montreal Convention case in a United States court unless the alternative forum is (i) authorized to hear the case pursuant to Article 33(1) or (2), and (ii) demonstrably the more appropriate venue.

Further, a decision to dismiss in favor of one of the fora designated by Article 33 would not appear to upset the balance the drafters of the Montreal Convention intended to strike between the interests of the passengers and the airlines. The requirements to invoke the fifth jurisdiction show that the drafters concluded that plaintiffs should have the initial choice of forum, but that the choice should be constrained to ensure litigation in a location with a significant connection to the defendant.[24] The doctrine of *forum non conveniens*, as established in the United States,

---

**23.** *See supra* note 18. In an unreported case, the district court for the Eastern District of New York dismissed a case arising under the Warsaw Convention on the basis of *forum non conveniens*, agreeing with the Fifth Circuit's reasoning in *New Orleans* that the doctrine is applicable to a Warsaw Convention case. *See Lu v. Air China Int'l. Corp.*, No. CV 92–1254,

1992 WL 453646, at *1 n. 1 (E.D.N.Y. Dec. 16, 1992).

**24.** For a plaintiff to invoke a Convention State as the fifth jurisdiction: (1) there must be damage resulting from the death or injury of a passenger, (2) the State must be the "principal and permanent residence" of the

is consistent with that balance by requiring that a court defer to plaintiff's choice of forum in assessing whether one of the other fora would be more appropriate in a case arising under the Convention. *See Reyno*, 454 U.S. at 255, 102 S.Ct. 252; *but see id.* at n. 23 (noting that although not dispositive, citizens or residents deserve "somewhat more deference" than foreign plaintiffs); 14D C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3828.2 (3d ed. 2007).

Finally, *forum non conveniens* encourages uniform implementation of the liability system and consistency of results because it facilitates the consolidation of multiple lawsuits arising out of a single air disaster in a single forum state.

### d. *Drafting History*

Plaintiffs argue that the drafting history of Article 33 is inconclusive with respect to the applicability of *forum non conveniens* in Montreal Convention cases: "The only clear and verifiable truth is that ultimately, the Montreal Convention, like its predecessor says nothing about the FNC doctrine." D.E. 101 (Pls.' Mem. in Opp'n to Mot.) at 24. The undersigned disagrees. While it is certainly true that the Montreal Convention does not expressly refer to the doctrine of *forum non conveniens*, it was a subject of extensive discussions in connection with the inclusion and drafting of the fifth jurisdiction that in the final instru-

ment appears in Article 33(2). Those discussions show that no consensus could be reached for the inclusion of express language codifying the doctrine, but they also show no inclination on the part of the delegates to restrict existing practices among the signatory States. Importantly, the Minutes of the Conference and related documents contain not a single proposal that would prohibit the courts of Convention States from employing *forum non conveniens*.

The discussion of *forum non conveniens* began in the Conference meetings in response to the proposal, supported by the United States, that the convention include a fifth jurisdiction allowing passengers or their heirs to sue in the state where the passenger lived. In supporting the proposal, the United States had anticipated that the addition of the fifth jurisdiction would aid in addressing the problem of "forum shopping" in the United States: "U.S. courts are far more likely to dismiss lawsuits brought by non-U.S. residents on the grounds of *forum non conveniens* if a convenient homeland court is available to the plaintiff because of the fifth jurisdiction." D.E. 151 (Conventional Filing of the Conference Minutes and Documents (hereinafter "Minutes" or "Documents")) [25] at 108 (DCW Doc. No. 12 ("forum shopping" aspect of paper presented by the U.S. titled "Article 27–Fifth Jurisdiction")).[26] The United States also had pro-

---

passenger at the time of the accident, (3) the State must be one to or from which the carrier operates services for the carriage of passengers by air, either on its own aircraft or on another carrier's aircraft pursuant to a "commercial agreement," and (4) the State must be one in which the carrier conducts its business of carriage of passengers by air from premises leased or owned by the carrier itself or by another carrier with which it has a "commercial agreement." *See* Montreal Convention, art. 33(2)-(3); *see also generally* Devendra Pradhan, *The Fifth Jurisdiction Under the Montreal Liability Convention: Wandering American or Wandering Everybody?*, 68 J. Air

L. & Com. 717 (2003) (discussing the adoption and potential impact of the fifth jurisdiction).

**25.** The Minutes and Documents are published by the International Civil Aviation Organization, Doc. 9775.

**26.** The United States advocated for the addition of the fifth jurisdiction, noting, *inter alia*, that it was "a matter of fundamental fairness;" U.S. citizens had been prevented from filing suits in U.S. courts in a number of Warsaw Convention cases due to the unavail-

vided a position paper to the Conference for its consideration in the adoption of the fifth jurisdiction explaining the operation of the doctrine of *forum non conveniens* in United States courts. *Id.* at 151–54 (DCW Doc. No. 27 (paper presented by U.S. titled "Two Cases Reflecting United States Law on Forum Non Conveniens")). In the paper, the United States had explained "[t]he primary purpose of *forum non conveniens* is to allow a court to resist impositions upon its jurisdiction and to protect the interests of parties to the litigation by adjudicating the claim in the most suitable and convenient forum. A forum is suitable and convenient when the entire case and all the parties come within the jurisdiction of that forum." *Id.* at 154.

The Minutes of the Conference meetings from May 17, 1999, reflect that the French delegate opposed the creation of a fifth jurisdiction because he was concerned that its inclusion would both encourage forum shopping in high compensation states and make it easier for courts applying *forum non conveniens* to dismiss foreign plaintiffs' claims in favor of courts located in poorer countries. *See* Minutes at 103–04, paras. 44–45.[27] The United States delegate responded that he disagreed that inclusion of the fifth jurisdiction would increase forum shopping since he anticipated that the increase in the number of cases brought in the United States due to the fifth jurisdiction [*i.e.*, by U.S. residents] would be offset by the number of cases that would be dismissed on *forum non conveniens* grounds due to the availability of a "home court" convenient forum for a

"forum shopping" plaintiff. *Id.* at 108, para. 62. He further suggested that the French delegate's concern that foreign plaintiffs would be consigned to litigation in their home countries through the application of *forum non conveniens* was not well-founded because, under the proposal, the fifth jurisdiction could not serve as an alternative forum unless it was both the principal and permanent residence of the passenger and a location where the carrier had a significant commercial presence. *Id.* at 108–09, paras. 63–64.

On May 19, 1999, the discussions respecting the fifth jurisdiction and *forum non conveniens* continued. The Minutes reflect, among other comments on the doctrine, that the Swedish delegate indicated that he would welcome the inclusion of any language that would authorize States to continue to apply *forum non conveniens* but would oppose any effort to impose the doctrine on others. The Minutes show that he commented as follows:

> With reference to draft Article 27 [*i.e.*, Article 33 in the final instrument], the Delegate of Sweden recalled that reference had been made to the possibility of provisions on *forum non conveniens* and his Delegation welcomed any such wording that would enable States presently applying that principle to continue doing so. However, he advised against any attempt to make that a standard provision for all States. It had been proposed, through lengthy discussions in other fora, that it should be a standard requirement applicable to all States, al-

---

ability of a fifth jurisdiction. *Id.* at 104. It was the view of the United States that passengers or heirs with claims arising under the new convention "should have the right to bring suit in the courts of the State where the passenger lived." *Id.* at 101.

**27.** The French delegate's views were endorsed by the delegates from Madagascar, India, Lebanon, Saudi Arabia, Lesotho, Cameroon, Korea, China and Gabon. *Id.* at 105, para. 49. More importantly, the French delegate's statements reflect that he anticipated that *forum non conveniens* dismissals would remain a possibility in some countries under the proposed jurisdiction.

though no conclusions had been reached at this point in time. He stated that *forum non conveniens* was unknown to most civil law countries and a number of States had firm instructions on such a position.

*Id.* at 144, para. 18.

The fifth jurisdiction and *forum non conveniens* were also considered later that day in the "Friends of the Chairman" Group.[28] In that meeting, the Chairman offered two ideas for further consideration in addressing fears that there would be a tendency for plaintiffs to favor a fifth jurisdiction "home base" as being more favorable to them "even in circumstances in which the critical connecting links between the passenger, the accident and the injury might be such that that forum could be regarded as an inconvenient forum ...." *Id.* at 148–49, paras. 6–7. The first idea concerned the possibility of codifying *forum non conveniens* within Article 27 so that a court seized of a case "would not be able to exercise its jurisdiction in circumstances in which it would be inconvenient or would create formidable difficulties, having regard to the connecting links of the case." *Id.* The second idea was to consider the first four bases of jurisdiction as primary, and if a plaintiff resorted to the fifth jurisdiction, he would have to show that it would be highly inconvenient or disadvantageous for him to resort to the existing four jurisdictions. *Id.*

In the context of these discussions, the Australian delegate proposed that Article 27 might be made subject to a provision requiring a court to be satisfied that it would be "manifestly unfair to permit the matter to be heard and decided in that jurisdiction and that there existed another jurisdiction in which the matter might properly, and with a view to the interests of all the parties, more fairly and conveniently heard and decided, in which case

the Court might dismiss the matter." *Id.* at 158, para. 17. The Chairman understood the proposal to be applicable to only the fifth jurisdiction: "The substance of the proposal was that a resort to the fifth jurisdiction would place a responsibility on the plaintiff to satisfy the Court on two counts: that there was not another jurisdiction in which the matter might properly, and with a view to the interests of all the parties, more fairly and conveniently be heard and decided; and that it would be manifestly unfair in all the circumstances for the matter to be heard and decided in that jurisdiction." *Id.,* para. 18. The proposal as formulated by the Chairman was tentatively endorsed by the delegates from Saudi Arabia and Canada, with the Minutes reflecting that the Canadian delegate observed that "while the doctrine of *forum non conveniens* might have elaborated originally in common law jurisdictions, it was now spreading throughout the world and was taken into account in modern Civil Codes, such as the new Quebec Civil Code" and that the "doctrine was entirely compatible with civil law systems ...." *Id.* at 158–59, para. 19.

The United States delegate underscored in his response that his delegation was unalterably opposed to any provision that would create a higher hurdle for the application of the fifth jurisdiction than would be applicable to the other four jurisdictions, as would be the case if only the fifth jurisdiction was made subject to *forum non conveniens* analysis. *Id.* at 159, para. 21. The United States delegate further made clear that, regardless of the action ultimately taken by the Conference on the issue of *forum non conveniens,* the United States would continue to apply the doctrine in any and all Convention cases in its courts. *Id.* The Minutes recount his comments as follows:

---

**28.** For a listing of the Group's members, *see* Minutes at 109, para. 66.

Indicating that he [*i.e.*, the U.S. delegate] was somewhat puzzled by the direction which the debate had taken, he noted that DCW Doc No. 27 presented by his Delegation described the doctrine of *forum non conveniens* as it was currently applied in the Courts of the United States to the existing four jurisdictions and as it would be applied to a fifth, sixth, seventh or eighth jurisdiction, if such jurisdictions were created. The Delegate of the United States noted that the doctrine of *forum non conveniens* would be applied to all five jurisdictions in his country whether the Group prescribed that or not. It seemed to him that that should provide substantial comfort to those concerned about judgments in his jurisdiction. The Delegate of the United States was concerned not only about not creating a higher hurdle for the application of the fifth jurisdiction than existed for the other four jurisdictions but also about the ratifiability of the new Convention. As has already been noted, there were jurisdictions which did not apply, understand or perhaps even desire *forum non conveniens*. He was concerned that, by proposing to impose such an alien concept on such jurisdictions, it would make it more difficult for them to accept the result. The Delegate of the United States was also concerned that, in attempting to codify on paper a doctrine which already existed in his country, the Group would do it in a way which would alter the jurisprudence which was already applicable in the United States and that such an alteration would be found to be obnoxious to the process which the Group had to follow.

The Delegate of the United States thus suggested that, to provide some measure of comfort to those concerned about the level of judgments in his jurisdiction and perhaps to others where *forum non conveniens* or similar doctrines which perhaps did not bear that precise name were applicable and to avoid any concern that by having the fifth jurisdiction, some Court would conclude that the *forum non conveniens* doctrine should not be applied, paragraph 4 of Article 27 ("Questions of procedure shall be governed by the law of the Court seised of the case.") should be amended by adding the phrase "including the doctrine of *forum non conveniens* or other similar doctrines". If any Delegate had such a similar doctrine that had a name, it could be included in that provision. The Delegate of the United States hoped that with his proposed amendment a certain degree of comfort might be gained without, as in the adage, throwing away the baby with the bathwater.

*Id.*, paras. 21–22.

Consistent with his remarks, it was also observed by other delegates that the *forum non conveniens* doctrine was relatively unknown in some European countries (*id.*, para. 20 (Swiss delegate's comment in this respect)), would be difficult to harmonize within some countries' legal systems (*id.* at 160, para. 26 (Chilean delegate's comments respecting Chile and several other unidentified Latin American countries)), and in fact, in an apparent reference to *Milor*, that the doctrine was inapplicable in England in cases arising under the Warsaw Convention. *Id.* at 161–62, paras. 31, 33.

In the course of these discussions the Conference Chairman questioned whether in the interest of achieving predictability and uniformity, it might be necessary to forge a common understanding of *forum non conveniens*. *Id.* at 159–60, para. 23; 162, paras. 32, 34; *also* 171, para. 15; 181, para. 28. The Minutes present the following account:

To the point raised by the Delegate of the United States that the imposition of that alien concept—a term which he found strange—might pose jurisdictional problems, the Chairman emphasized that the Group was involved in the process of seeking uniformity.... Recognizing, as he did, that in some jurisdictions the concept of *forum non conveniens* might not exist in a particular form, as well as that many of the elements of the Convention relating to the burden of proof, what was required to be proved and the limits of liability also did not exist in the domestic legislation of many countries, the Chairman indicated that it would be necessary to make adjustments to such legislation in order to achieve uniformity. He therefore appealed to the Group to search for solutions which were commonly acceptable, even in the knowledge that they might entail adjustments to domestic jurisdictions.

*Id.* at 159–60, para. 23. The Chairman further noted that "the Group would need to look most carefully as to whether or not in all the circumstances it would be achieving its purposes if it did not expressly provide for [*forum non conveniens*] in the Convention. It would seem that if *forum non conveniens* was to play a role, that would have to be clearly indicated, having regard to the jurisprudence which might or might not exist in some countries." *Id.* at 161–62, paras. 31–32.

Next, the Minutes reflect that the delegate from the United Kingdom, apparently referring to the *Milor* decision, indicated that "[i]t did not seem to him that the Group would really be modernizing and consolidating the Warsaw Convention if the Group were to make it necessary for the plaintiff to fight for his existing right to bring his action at the place of his choice and to leave a decision thereon to the Court." *Id.* at 162, para. 33. In response:

The Chairman indicated that the last two comments had left him in a state of some confusion: the Delegate of the United Kingdom had stated that in his jurisdiction, it was the option of the plaintiff to determine which of the four jurisdictions would apply and that the principle of *forum non conveniens* had been determined not to apply; it had also been indicated that it was desirable to add a fifth jurisdiction and to circumscribe its application so as to ensure that the mischief that was perceived by many to exist in relation to that jurisdiction might indeed be fenced in. Averring that the Group could not have it both ways, he considered that if the Group did recognize that it gave rise to such mischief, then either it would determine that the fifth jurisdiction had its peculiar problems and that it therefore might be desirable to put fences in appropriate places to deal with those problems, or it would recognize that all of the jurisdictions would be subject to a *forum non conveniens* rule and, to that extent, would modify even the existing Convention rules. If, as indicated by the Observer from the IUAI, there were no cases in the United States in which the principle of *forum non conveniens* had been applied to Convention cases, then it would indicate the importance of dealing with that as an issue, certainly in relation to the fifth jurisdiction. If it were to be dealt with in relation to the other jurisdictions, then it would have to be done on the basis that the rules were being changed or clarified so that there would be uniformity in the application of the rules across the whole spectrum of jurisdictions. The issue which the Group would have to decide upon was whether it was fair to circumscribe the conditions under which the fifth jurisdiction would be exercisable, in the knowledge that concerns had been expressed

and in the hope that the Group would be able to deal with the question of how to achieve uniformity and a degree of universality in dealing with the issue. The suggestion had been made that perhaps it could be dealt with under paragraph 4 of Article 27, in which questions of procedure were governed by the Court seised of the case, and that that could be elaborated upon in dealing with the introduction of the basic parameters of *forum non conveniens*. However, if, in light of what had just been said, it were dealt with in paragraph 4, which was of general application to all of the provisions contained in Article 27, then it would apply to all jurisdictions.

*Id.*, para. 34.

The Minutes show that the delegate of Singapore next remarked that:

[O]ne possible, logical interpretation of paragraph 1 of Article 27 would be that the plaintiff had the option of bringing his action for damages in one of the four jurisdictions indicated. It was up to him to make the choice. The rules in that chosen jurisdiction would accordingly apply to him. He observed that the doctrine of *forum non conveniens* was a common law doctrine which would apply in all cases unless there were a statutory provision against it. Thus all that the expression "at the option of the plaintiff" meant was that it was for the plaintiff to decide in which jurisdiction to bring his action. Even if he did not succeed in having his case heard in the first jurisdiction so chosen, nothing would prevent

him from bringing his action in one of the other jurisdictions. Thus even if that expression were retained, the action would be initiated and the preliminary question of whether the jurisdiction chosen by the plaintiff was the most appropriate forum would be overcome. The case would then proceed.

*Id.* at 162–63, para. 36.

The Group returned to the discussion of Article 27 and the "fifth jurisdiction" during May 20–21, 1999, considering proposed language specifying that a court could decline jurisdiction in certain circumstances where a plaintiff filed her action in the fifth jurisdiction. *Id.* at 167, para. 1; 170–71, paras. 13–17; Documents at 491 (DCW–FCG No. 1, "Draft Consensus Package"), art. 27(4).[29] Upon inquiry from the Swiss delegate on whether the language under consideration contained the same elements as when one spoke about *forum non conveniens*, the Minutes reflect that the Chairman explained:

[T]he concept of *forum non conveniens* was a concept which allowed the court to make a determination that it was inappropriate for a matter to be brought in a certain forum, having regard to a variety of considerations. The considerations which were outlined in Article 27 were indicative of those which a court could properly take into account. Subparagraph b) of paragraph 4 addressed also the need to highlight the fact that it was not enough to say that it was an inconvenient forum; it was necessary to

---

**29.** The language under consideration provided in pertinent part:

4. Questions of procedure shall be governed by the law of the Court seised of the case. The court may decline to exercise jurisdiction on the basis of the additional jurisdiction set out in paragraph 2 of this Article [*i.e.*, the fifth jurisdiction], if the carrier proves

a) that having regard to the circumstances of the accident and the issues to be determined it would place too onerous a burden on the carrier for the case to be heard and determined in that jurisdiction, and

b) there exists another jurisdiction in which the case may be properly, and with a view to the interests of all the parties, more fairly and conveniently be determined.

also show that there was access to another forum which was more convenient. The Chairman was not certain that in some jurisdictions, apart from indicating that a forum was not convenient, a court would in fact go further and indicate where a more convenient forum could be found. Recognizing, therefore, that the Convention itself established other bases for jurisdiction, it then became necessary to examine the other bases in order to determine whether or not there was another convenient forum. The Chairman therefore regarded paragraph 4b) of Article 27 as being appropriate because the Convention delineated the forum. It was correct that the provision covered more than the *forum non conveniens* mentioned in Article 28, paragraph 4. The fact remained, however, that different jurisdictions applied, with different rules in the application of *forum non conveniens*. What the Conference was attempting to do was provide a Convention rule.

Minutes at 174, para. 28.

The delegate of the United States voiced his opposition to the draft *forum non conveniens* provision, again, because it limited the fifth jurisdiction in a manner not applicable to the other four jurisdictions; in his view the provision would be counter-productive to the notion that the fifth jurisdiction would help minimize "forum shopping," as he had suggested in initially supporting its addition. *Id.* at 180, para. 24. Thus, the delegate from the United States suggested that the provision should be clarified to state that it was not intended "to limit the ability of courts, in their discretion, applying the law of the court seised of the case to dismiss cases that more properly belonged in one of the other jurisdictions." *Id.* The Chairman requested the United States delegate to provide his proposal in writing. *Id.*, para. 25. The Swedish delegate expressed support for the clarification proposed by the United States delegate because, in conjunction with the language that "questions of procedure shall be governed by the law of the court seised of the case," the clarification would be consistent with an interpretation that States that currently applied *forum non conveniens* could continue to do so, while not making it mandatory for States that did not apply the doctrine to insert it into their national laws, thus presenting problems of ratifiability. *Id.* at 181, para. 27; *see also* para. 29 (European Community Observer echoing Swedish delegate's comments, noting that *forum non conveniens* was "foreign to the legal system in a large number of courts" and that "[i]f it was to go in, it would have to do so in a very careful manner, perhaps in the way that had been suggested").

The Swiss delegate then summarized his understanding of the *forum non conveniens* doctrine, noting that it is a matter of procedural, not substantive law. *Id.* at 181–82, para. 30. He also observed that the doctrine had been said to apply differently in different legal systems, and that it was unknown in his country, where a court had to take every case in which there was jurisdiction. *Id.* Thus, the Swiss delegate proposed maintaining the language of Article 28(2) of the Warsaw Convention— "[q]uestions of procedure shall be governed by the law of the Court seised of the case"—and not the additional language under consideration that was intended to apply only to cases brought in the fifth jurisdiction. *Id.*, paras. 30, 34. The Swiss delegate was of the view that the additional language would not enhance the Conference's efforts to unify the law. *Id.*, para. 32. Specifically, he noted that the mandatory language of Article 27(4) (*i.e.*, "questions of procedure *shall be governed* by the law of the court seised of the case") allowed a court to examine the *forum non conveniens* issue, whether the parties ar-

gued it or not, in those jurisdictions in which the doctrine was observed, while the proposed additional language would introduce the concept, albeit as a discretionary tool, even in jurisdictions like Switzerland that did not apply the doctrine. *Id.*, paras. 30–33. Citing the uncertain treatment that the proposed language would receive in States where the doctrine was not part of the local law, the Swiss delegate suggested that "[t]he Conference should not try to unify one special element of procedure by adding an unclear rule in the Convention." *Id.*, paras. 33, 34. Thus, the Swiss delegate was of the opinion that the wording of Article 28(2) of the Warsaw Convention should be maintained and that the additional proposed language should be deleted. *Id.*, para. 34.[30]

The Minutes reflect that by the conclusion of the Group's meetings, the Chairman had come to believe that if the treaty expressly allowed for the application of *forum non conveniens* by those States employing the doctrine, its inclusion would not undermine the delegates' efforts to unify and codify the liability regime of the Montreal Convention. They contain the following account of the Chairman's closing comments respecting *forum non conveniens:*

In relation to what was contained in paragraph 4 of Article 27 in dealing with the question of *forum non conveniens,* there had been a rather intensive discussion as to the place it could occupy, having regard to the different jurisprudential bases of the civil law and common law systems in particular, and that *forum non conveniens* was a foreign concept in some jurisdictions. Indeed, there was the view that in those countries which did not recognize the concept

there would be problems of ratification. Without prejudice to the legitimacy of the questions as to whether or not an injustice could be brought about by persons who would seek to resort to an inconvenient jurisdiction and in the search for uniformity and codification of law, *the Chairman indicated that the suggestion made by the Representative of the United States, to indicate that it would be enough to indicate that nothing in this article is intended to limit the ability of the court seised of the case to dismiss cases which could more properly belong to another of the jurisdictions stated in the Convention, would in fact preserve the right of those States which had the forum non conveniens principle and in no way derogated from those who did not have it. It would leave the door open to the latter to think in the future as to whether it may well be appropriate to change their own law if they so wished.*

*Id.* at 183–84, para. 38 (emphasis added). According to the Minutes, this was the last time the "Friends of the Chairman Group" met; the Conference then proceeded with meetings of the "Commission of the Whole" and "Plenary" meetings. *Id.* at iv-vii (Table of Contents).

Thereafter, in his report to the Commission on Friday, May 21, 1999, the Chairman described the status of the negotiations regarding the codification of *forum non conveniens* in Article 27 as ongoing. According to the record of proceedings, he reported:

There had also been intense discussion on the question of *forum non conveniens;* i.e. whether or not in relation to the jurisdiction provided by the Conven-

---

**30.** Whether as a result of this Swiss delegate's suggestion, or for other reasons not reflected in the Minutes, the final instrument maintains the language of Article 28(2) of the Warsaw Convention, and not the additional language then under consideration. *Compare* Warsaw Convention, art. 28(2), *with* Montreal Convention, art. 33(4).

tion it might be possible to find any appropriate language which would assist in the elimination of the practice of "forum shopping", whereby people would go to what they considered to be the jurisdiction in which they would be able to get the best result. This matter had arisen primarily in articulation of the fifth jurisdiction, although it might well be appropriate to other jurisdictions. *Suggestions made in this connection would have sought to require the court to determine whether or not it was a convenient jurisdiction. Those discussions had remained somewhat inconclusive, although the Chairman was encouraged by the fact that the Conference had reached a stage of its discussions where specific suggestions for addressing specific problems were now being made.* Therefore, to the extent that delegations had problems, it was expected that they would make specific proposals to resolve those problems rather than simply assert that the problems existed.

*Id.* at 187, para. 9 (emphasis added). The Chairman indicated that consultations would continue bilaterally and across delegations during the weekend, and that he expected that a revised draft of the language under consideration would be available on Monday, May 24, 1999. *Id.,* para. 10. However, the drafts circulated during this time reflect that all language related to the *forum non conveniens* principle had been deleted from consideration by May 24, 1999. *See* Documents at 495–502 (Revisions to DCW–FCG No. 1, "Draft Consensus Package"), art. 27.

Late on Tuesday, May 25, 1999, the Chairman presented the consensus package that included Article 27; it did not contain *forum non conveniens* language. *See* Minutes at 199, para. 1; Documents at 271 (DCW No. 50, "Consensus Package"), art. 27.[31] In advocating approval of the package as a whole, "[t]he Chairman reiterated that the consensus package was to be seen in the context of the Group's having exhausted all possible means of arriving at consensus. It had done so on the basis of the widest possible consultations, of taking into account the concerns of all, of recognizing that no Delegation would find it an ideal solution to all its States'

---

**31.** Article 27 of the consensus package provided:

1. An action for damages must be brought, at the option of the plaintiff, in the territory of one of the States Parties, either before the Court of the domicile of the carrier or of its principal place of business, or where it has a place of business through which the contract has been made or before the Court at the place of destination.

2. In respect of damage resulting from the death or injury of a passenger, an action may be brought before one of the Courts mentioned in paragraph 1 of this Article, or in the territory of a State Party in which at the time of the accident the passenger has his or her principal and permanent residence and to or from which the carrier operates services for the carriage of passengers by air, either on its own aircraft, or on another carrier's aircraft pursuant to a commercial agreement, and in which that carrier conducts its business of carriage of passengers by air from premises leased or owned by the carrier itself or by another carrier with which it has a commercial agreement.

3. For the purposes of paragraph 2,
 (a) "commercial agreement" means an agreement, other than an agency agreement, made between carriers and relating to the provision of their joint services for carriage of passengers by air;
 (b) "principal and permanent residence" means the one fixed and permanent abode of the passenger at the time of the accident. The nationality of the passenger may be considered as a factor, but shall not be the determining factor in this regard.

4. Questions of procedure shall be governed by the law of the Court seised of the case.

problems." Documents at 205, para. 17. The Chairman further noted that:

> While it was not possible to solve the problems of the world in one Conference, the Conference could make a beginning, an important step forward which would lead to something which would be a significant advance on that which the Conference had. The Conference could do so in recognition of the fact that the consequences of a failure to make a beginning would be far more disastrous that not accepting a package of this kind. Recalling that he had presented the package as being indivisible, the Chairman indicated that it was because he firmly believed that the Conference had a unique opportunity, a unique challenge, to lay better foundations for the liability régime in respect of the carriage of passengers, baggage and cargo, and that if it allowed that opportunity to pass, the consequences would be far worse than accepting a package in this form. The Chairman thus commended the consensus package of the Conference for its acceptance as a whole. He implored that it be accepted as all possible means had been exhausted. He affirmed that history would not forgive the Conference if it lost this opportunity.

*Id.*

The consensus package was adopted (*id.* at 206, para. 19), and the final instrument, which was ratified by the United States Senate on July 31, 2003, contains substantially the same language from the package,[32] renumbered as Article 33.

What the preceding drafting history shows is that no State advanced a proposal which if adopted would have precluded the application of *forum non conveniens* to Montreal Convention cases in the courts of States adhering to the doctrine. Instead, it shows that the doctrine was extensively discussed, mainly with respect to the creation of the fifth jurisdiction, that proposals addressing the doctrine were advanced, including proposals which would have made *forum non conveniens* applicable only to the fifth jurisdiction or clarified its applicability to all jurisdictions, and that the United States actively and persistently opposed the inclusion of any *forum non conveniens* language except to clarify its general applicability, all while making it abundantly clear that United States courts would continue to employ the doctrine in Montreal Convention and other international cases. In the end, the consensus among the delegates was to omit any language respecting the applicability of *forum non conveniens* to avoid imposing the doctrine on States that do not employ it and distorting its application in States where it is commonly employed. In other words, the delegates determined to maintain the status quo: signatory countries employing the doctrine would continue to do so pursuant to subsection (2): "Questions of procedure shall be governed by the law of the court seised of the case," and signatory countries that do not employ the doctrine would not be required to adjust their legal systems to accommodate the doctrine in cases arising under the Convention.

### e. *Post–Ratification Understanding*

Plaintiffs concede the absence of any post-ratification history reflecting the signatories understanding whether *forum non conveniens* would continue to be applicable in Montreal Convention cases

---

**32.** The only difference between Article 27 in the consensus package and Article 33 in the final instrument is the deletion of the following italicized language in the final instrument: The nationality of the passenger *may be con-sidered as a factor, but* shall not be the determining factor in this regard. *Compare* supra note 31, *with* Montreal Convention, art. 33(3)(b), quoted *supra* p. 1310.

brought in States adhering to the doctrine. *See* D.E. 101 (Pls.' Mem. in Opp'n to Mot.) at 24. Nonetheless, Plaintiffs argue on the basis of representations made by the Executive Branch to the United States Senate to secure ratification of the Montreal Convention that "(1) preserving the right of U.S. Courts to apply [*forum non conveniens* ] was *not* a central concern, and (2) the jurisdictional provisions of the Montreal Convention give plaintiffs a *right* to pursue their claims in the enumerated forums." *Id.* at 24–25 (emphasis in original).

In support of their first point, Plaintiffs quote testimony of John R. Byerly, Deputy Assistant Secretary for Transportation Affairs, to the Senate Foreign Relations Committee, in which he stated that the United States delegation achieved "all of America's core objectives" and that "[t]he Convention contains all of the key provisions sought by the United States at the outset of the negotiations." *Id.* at 25 (citing http://www.state.gov/e/eeb/rls/rm/2003/ 21869.htm). These statements do not show that the United States relinquished *forum non conveniens* in the negotiations for the Convention. Moreover, Plaintiffs omit to acknowledge that Mr. Byerly also stated that "prior judicial interpretations under [the Warsaw Convention] are expected to have continuing validity." At the time of these remarks, the Ninth Circuit's *Hosaka* decision stood in opposition to the Fifth Circuit's decision in *In re . . . New Orleans,* and the Southern District of New York's decision in *In re . . . Long Island.* Therefore, Byerly's remarks do not demonstrate that the United States or any other signatory State understood at the time of ratification that *forum non conveniens* was precluded in Montreal Convention cases.

As to the second point, Plaintiffs quote the following testimony of Jeffrey Shane,

Under Secretary for Policy in the U.S. Department of Transportation:

> A second major passenger benefit provided by the Montreal Convention is the *right* of claimants to bring action in a forum related to the passenger's principal and permanent residence. *This provision will ensure in the vast majority of cases that an injured American passenger or a claimant on behalf of a deceased American passenger will be able to bring action in a U.S. court.*

*Id.* at 25 (quoting S. Exec. Rpt. 108–8, at 13) (emphasis added by Plaintiffs). Plaintiffs also point to Deputy Secretary of State Strobe Talbott's letter of submittal to President Clinton:

> [T]his fifth jurisdiction provision should ensure that nearly all U.S. Citizens and other permanent residents of the United States have access to U.S. Courts to pursue claims under the convention.

*Id.* (quoting S. Treaty Doc. No. 106–45, 1999 WL 33292734, at 15–16). According to Plaintiffs, these statements "would have been singularly misleading if they harbored an unstated belief that the new "right" to file in the U.S. was qualified by the airlines' "right" to secure prompt dismissals on [*forum non conveniens* ] grounds." *Id.* But these statements are not untrue or misleading. The fact is that in most cases, United States citizens and permanent residents will be able to maintain actions under the Montreal Convention in United States courts because United States citizens enjoy significant deference in their choice of forum under the *forum non conveniens* doctrine [33] and because, as required by Article 33(2), the fifth jurisdiction, most airlines operate or conduct business in the United States either directly or through a commercial agreement with another carrier.

---

**33.** *See Reyno,* 454 U.S. at 255, 102 S.Ct. 252; 14D C. Wright, A. Miller & E. Cooper, Feder-

al Practice and Procedure § 3828.2 (3d ed. 2007).

**f.** *Position of the United States*

"Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." *See Avagliano,* 457 U.S. at 184–85, 102 S.Ct. 2374; *accord Sanchez–Llamas,* 126 S.Ct. at 2685. That understanding is contained in the Statement of Interest filed in this case pursuant to 28 U.S.C. § 517, by attorneys from the United States Department of Justice, with attorneys from the Department of State and the Department of Transportation appearing as of counsel. *See* D.E. 116 (Statement of Interest of the United States).

The Statement of Interest makes clear that the United States did not relinquish the ability of its courts to apply *forum non conveniens* in Montreal Convention cases because it and its component agencies are often named in suits arising under the Convention and because the United States has a significant interest in avoiding forum shopping and congestion in its courts when a foreign forum provides a more just, convenient and suitable alternative. Accordingly, the United States understands the text of Article 33(4) to mean that the Montreal Convention "defers to the forum's laws on all questions of procedure and manifests an intent by the drafters not to alter the judicial system of any country on questions of procedure." *Id.* at 3. In this regard, the Statement of Interest also points, persuasively, to the Supreme Court's statement in *Breard,* 523 U.S. at 375, 118 S.Ct. 1352, that "it has been recognized in international law that, absent a clear and express statement to the contrary, the procedural rules of the forum State govern the implementation of the treaty in the State." *Id.* at 3 n. 3. Because the Montreal Convention does not expressly preclude application of the doctrine and because the doctrine is a well-established

rule of procedure, *forum non conveniens* is applicable in Montreal convention cases.

The United States also emphasizes that when the Montreal Convention was drafted, *Hosaka* had not been decided; therefore, the drafters understood that *forum non conveniens* was accepted procedure in some States, including the United States, and that it would be applied under the Montreal Convention; for that reason, no clarifying amendment to Article 33(4) was necessary. *Id.* at 4–5.

### Conclusion

Based on the foregoing, this Court finds that Newvac is a "contracting carrier" pursuant to Article 39 of the Montreal Convention and that the doctrine of *forum non conveniens* is applicable in this proceeding pursuant to Article 33(4) of the Montreal Convention: "Questions of procedure shall be governed by the law of the court seised of the case." The parties shall now proceed to brief the issue of whether these cases should be dismissed on the ground of *forum non conveniens* in accordance with the schedule established at the status conference held on September 7, 2007.